**IN THE UNITED STATES DISTRICT COURT  
FOR THE WESTERN DISTRICT OF VIRGINIA  
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **MARSHALL McALLISTER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00016 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Marshall McAllister, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McAllister protectively filed his current applications for DIB and SSI on March 31, 2006, alleging disability as of February 1, 2006, due to bulging discs, sleep apnea and ruptured tendon in the left thumb. (Record, ("R."), at 132-34, 173, 371, 372-77.) The claims were denied initially and upon reconsideration. (R. at 86-88, 112, 379-81, 384-86.) McAllister then requested a hearing before an administrative law judge, ("ALJ"). (R. at 89.) The ALJ held a hearing on April 10, 2008, at which McAllister was represented by counsel. (R. at 26-69.)

By decision dated July 25, 2008,[1] the ALJ denied McAllister's claims. (R. at 15-25.) The ALJ found that McAllister met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2009. (R. at 17.) The ALJ also found that McAllister had not engaged in substantial gainful activity since February 1, 2006, the alleged onset date. (R. at 17.) The ALJ determined that the medical evidence established that McAllister suffered from severe impairments, namely degenerative joint disease, degenerative disc disease, a back disorder and

---

[1]On March 31, 2006, McAllister protectively filed applications for DIB and SSI. (R. at 74.) The claims were denied initially and upon reconsideration. (R. at 74, 84, 86-88.) McAllister requested a hearing before an ALJ. (R. at 89.) By decision dated June 27, 2007, the ALJ denied McAllister's claims. (R. at 74-79.) By order of the Appeals Council, McAllister's claims were remanded for further consideration. (R. at 81-83.)

status post left thumb surgery, but he found that McAllister did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 20.) The ALJ found that McAllister had the residual functional capacity to perform light work[2] limited by an occasional ability to push and pull with his upper and lower extremities, to climb stairs and ramps, to balance, to stoop, to kneel, to crouch and to handle objects with his left nondominant hand and an inability to crawl, to work around moving machinery and unprotected heights and to withstand concentrated exposure to temperature extremes. (R. at 20-21.) Thus, the ALJ found that McAllister was unable to perform his past relevant work as a brick mason and a construction laborer. (R. at 23.) Based on McAllister's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that McAllister could perform, including jobs as an interviewer, an information clerk and a security guard. (R. at 23.) Thus, the ALJ found that McAllister was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 24-25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued his decision, McAllister pursued his administrative appeals, (R. at 11), but the Appeals Council denied his request for review. (R. at 6-8.) McAllister then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). The case is before this court on McAllister's motion for summary judgment filed August 27, 2009, and the Commissioner's motion for summary

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

judgment filed October 13, 2009.

## II. Facts

McAllister was born in 1958, (R. at 33, 132), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). McAllister testified that he completed the eighth grade.[3] (R. at 50-51.) McAllister has past relevant work as a brick mason laborer and a bricklayer. (R. at 35.)

J. Herbert Pearis, a vocational expert, also was present and testified at McAllister's hearing. (R. at 61-68.) Pearis classified McAllister's past work as a brick mason as heavy[4] and skilled. (R. at 62.) He classified McAllister's past work as a construction laborer as very heavy[5] and unskilled. (R. at 62.) Pearis was asked to consider an individual of McAllister's age, education and work background, who had the residual functional capacity to perform light work that did not require more than occasional pushing and pulling with the upper and lower extremities, climbing stairs and ramps, balancing, stooping, kneeling and crouching, who could not climb ladders, ropes or scaffolds and who could not crawl. (R. at 63.) Pearis testified that there

---

[3]McAllister indicated on his Disability Report that he completed the tenth grade. (R. at 179.) However, he testified at his hearing that he completed the eighth grade. (R. at 50-51.)

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2009).

[5]Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can do very heavy work, he also can do heavy, medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(e), 416.967(e) (2009).

-4-

would be a significant number of jobs available in the national economy that such an individual could perform, including jobs as a general production inspector, a silver wrapper and an interviewer. (R. at 63.) Pearis stated that the same individual, but who also would be limited to occasional handling with his left nondominant hand, could perform the job of an interviewer, an information clerk, a security guard and a messenger courier. (R. at 64.) Pearis was asked to consider the same individual, but who would be limited to sedentary work.[6] (R. at 65.) He stated that there were jobs available that such an individual could perform, including jobs as a surveillance system monitor, an interviewer and a receptionist information clerk. (R. at 65-66.)

In rendering his decision, the ALJ reviewed records from Dr. Ali A. Hijazi, M.D.; Alleghany Regional Hospital; Dr. Ronald S. Goings, M.D.; Dr. Brian A. Torre, M.D.; Dr. John O. Collins, M.D., a neurologist; Alleghany Highlands Free Clinic; University of Virginia Health System; Dr. Richard Surrusco, M.D., a state agency physician; and Dr. Michael Hartman, M.D., a state agency physician.

On April 16, 2003, Dr. Ali A. Hijazi, M.D., saw McAllister for his complaints of dizziness, headaches and weakness. (R. at 238.) McAllister reported that he was still consuming alcohol. (R. at 238.) Dr. Hijazi diagnosed probable jaundice, hypertension, controlled, gastritis, better-controlled, probable alcohol-induced

---

[6]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

myopathy causing pain in his hands and legs and depression. (R. at 238.) Dr. Hijazi advised McAllister to stop consuming alcohol because he believed that the alcohol was causing most of McAllister's problems. (R. at 238.) On January 13, 2004, McAllister reported that his depression was much better. (R. at 234.) On April 20, 2004, McAllister reported that he was doing fine and that he had no depression symptoms. (R. at 232.) On April 26, 2004, an ultrasound of McAllister's abdomen was normal. (R. at 231.) On August 3, 2004, McAllister complained of dizziness, headaches, blurred vision, sensitivity to light and nausea. (R. at 229.) He reported that he was still consuming alcohol. (R. at 229.) Abduction was abnormal in his left thumb. (R. at 229.) Straight leg raising tests were normal, and reflexes were normal and symmetrical. (R. at 229.) Dr. Hijazi reported that he believed McAllister's weakness, weight loss and mild headaches were a result of depression and alcoholism. (R. at 229.) On February 8, 2005, Dr. Hijazi reported that McAllister was still consuming alcohol excessively. (R. at 228.) Dr. Hijazi reported that McAllister's complaints of dizziness and weakness were possibly due to his alcoholism. (R. at 228.)

The record shows that Dr. John O. Collins, M.D., a neurologist, treated McAllister from January 6, 2005, through October 2, 2007, for various complaints such as dizziness, blurred vision, cephalgia, cervical muscle spasm, degenerative joint disease, myofascial pain, neck pain, paresthesias in the arms and fingers with suspicion of cervical radiculopathy, sleep apnea, restless leg syndrome and gastroesphageal reflux disease. (R. at 264-308, 330-42.) On March 28, 2005, x-rays of McAllister's cervical spine showed mild C5-C6 discogenic degenerative changes which included disc space narrowing and discogenic spurring at the ventral and dorsal

intake margins and mild Luschka joint hypertrophy with symmetric neuroforaminal steonsis. (R. at 298, 300.) An MRI of McAllister's cervical spine showed mild indentation of the ventral left cervical cord and moderate left lateral recess and neuroforaminal stenosis at the C5-C6 disc space due to small posterior left disc protrusion with spondylitic ridging at the end plates, along with mild facet hypertrophy. (R. at 298, 301-02.)

McAllister underwent a sleep study in September 2005 and another in November 2005, both of which showed that he suffered from obstructive sleep apnea syndrome. (R. at 275-84.) In April 2006, x-rays of McAllister's lumbar spine showed progressive mild to marked multilevel degenerative disc disease. (R. at 266.) An MRI of McAllister's lumbar spine showed progressive degenerative changes at the L4-L5 level with a mild to moderate diffuse disc bulge and stable marked degenerative disc disease at the L5-S1 level with a mild broad-base lateral chronic disc protrusion with mild bony overgrowth creating mild to moderate asymmetric left lateral recess and neural foraminal stenosis. (R. at 268.) In September 2007, an MRI of McAllister's lumbar spine showed degenerative disc disease, bilateral neuroforaminal encroachment at the L4-L5 level with left-sided neuroforaminal encroachment and degenerative disc bulge at the L5-S1 level. (R. at 338, 353.)

The record shows that Dr. Ronald S. Goings, M.D., treated McAllister from February 1, 2005, through January 31, 2006, for nervous anxiety, chronic low back pain, erectile dysfunction, frequent dizziness, weakness, visual disturbance, tingling sensations and arthritis. (R. at 255-56.) In February 2005, x-rays of McAllister's back showed severe degenerative changes, but no evidence of radiculopathy. (R. at

256.) On February 21, 2005, McAllister reported that medication was helping his symptoms of anxiety and depression. (R. at 256.)

On July 4, 2005, McAllister was seen at the emergency room at Alleghany Regional Hospital after being struck by a car. (R. at 239-49.) McAllister's spouse reported that she was attempting to leave, and McAllister jumped on the hood of her car. (R. at 242.) She stated that when she applied the brakes, McAllister rolled off the hood of the car onto the ground. (R. at 242.) She reported that McAllister had consumed 12 beers that day, in addition to taking his medication. (R. at 242.) X-rays of McAllister's cervical spine showed moderate degenerative changes and spondylitic spurring at the C5-C6 disc space, with moderate bilateral neural foraminal stenosis. (R. at 243.) X-rays of McAllister's left and right shoulders showed no fracture or abnormality. (R. at 243.) A CT scan of McAllister's head was normal, with the exception of minimal ethmoid sinus disease. (R. at 245.) McAllister was diagnosed with contusions to his head and shoulders. (R. at 240.)

On February 24, 2006, Dr. Brian A. Torre, M.D., saw McAllister for a left hand consultation. (R. at 262-63.) McAllister complained of left wrist pain and loss of exterior indicis proprius, ("EPL"), of the left thumb. (R. at 262.) Dr. Torre diagnosed chronic rupture of the EPL tendon, for which EPL transfer surgery was recommended. (R. at 262-63.) Dr. Torre performed the surgery on March 9, 2006. (R. at 259-60.) At a follow-up appointment in April 2006, Dr. Torre reported that McAllister's thumb had good alignment and extension with good tenodesis effect. (R. at 257.)

On May 18, 2006, Dr. Michael Hartman, M.D., a state agency physician, indicated that McAllister had the residual functional capacity to perform light work. (R. at 316-22.) He indicated that McAllister could stand and/or walk a total of two hours in an eight-hour workday. (R. at 317.) Dr. Hartman found McAllister's ability to push and/or pull was limited in his upper and lower extremities. (R. at 317.) He found that McAllister could occasionally climb, balance, stoop, kneel and crouch, but never crawl. (R. at 318.) He found that McAllister's ability to reach in all directions, including overhead, and to handle objects was limited in his left hand. (R. at 318.) No visual or communicative limitations were noted. (R. at 318-19.) Dr. Hartman indicated that McAllister should avoid concentrated exposure to temperature extremes and avoid all exposure to hazards. (R. at 319.)

On August 22, 2006, Dr. Richard Surrusco, M.D., a state agency physician, indicated that McAllister had the residual functional capacity to perform light work. (R. at 309-15.) He indicated that McAllister could stand and/or walk a total of two hours in an eight-hour workday. (R. at 310.) Dr. Surrusco found McAllister's ability to push and/or pull was limited in his upper and lower extremities. (R. at 310.) He found that McAllister could occasionally climb, balance, stoop, kneel and crouch, but never crawl. (R. at 311.) He found that McAllister's ability to reach in all directions, including overhead, and to handle objects was limited in his left hand. (R. at 311.) No visual or communicative limitations were noted. (R. at 311-12.) Dr. Surrusco indicated that McAllister should avoid concentrated exposure to temperature extremes and avoid all exposure to hazards. (R. at 312.)

On December 12, 2007, McAllister was seen at the Alleghany Highlands Free

Clinic for complaints of back pain and trouble urinating. (R. at 346.) He was diagnosed with benign prostatic hyperplasia, ("BPH"), chronic cervical/lumbar pain with radiculopathy. (R. at 346.) In January 2008, McAllister's BPH symptoms had improved with medication. (R. at 345.) In March 2008, McAllister was diagnosed with anxiety, depression, chronic cervical/lumbar pain and BPH. (R. at 344.)

On January 23, 2008, McAllister was seen at the University of Virginia Health System for complaints of low back pain that radiated to both legs. (R. at 367-70.) He was able to heel and toe walk without limitation. (R. at 368.) He had symmetric strength, sensation and reflexes of both lower extremities. (R. at 368.) McAllister's neck range of motion was intact. (R. at 368.) Straight leg raising tests were negative. (R. at 368.) X-rays of McAllister's lumbar spine showed degenerative disc disease at the L3-S1 levels. (R. at 368.) An MRI showed bilateral foraminal stenosis at the L4-L5 level and left foraminal stenosis at the L5-S1 level. (R. at 368, 370.) On January 30, 2008, McAllister had an epidural steriod injection. (R. at 364-65.) On February 27, 2008, McAllister complained of numbness in his hands and low back pain that radiated into his legs. (R. at 358-59.) He reported that the epidural steroid injection did not improve his symptoms. (R. at 358.) McAllister had symmetric strength in both lower extremities. (R. at 358.) X-rays of McAllister's cervical spine showed degenerative changes, predominantly at the C5-C6 disc space, but no instability. (R. at 358, 360.) He was diagnosed with lumbar stenosis and degenerative disc disease. (R. at 358.)

On March 12, 2008, McAllister complained of bilateral hand numbness. (R. at 355-57.) He had decreased cervical range of motion in all planes. (R. at 355.) His

extremities had no clubbing, cyanosis, edema or muscle wasting. (R. at 355.) McAllister lacked full left thumb adduction. (R. at 355.) He had normal motor strength in all major muscle groups. (R. at 355.) A motor nerve conduction study and sensory nerve conduction study were performed and showed bilateral median neuropathy at the wrist, left ulnar nerve notable for mild focal demyelination at the elbow without significant axonal loss, and ulnar sensory latencies were mildly delayed bilaterally. (R. at 356-57.) McAllister was diagnosed with mild to moderate carpal tunnel syndrome, mild left ulnar neuropathy at the elbow and relatively mild generalized peripheral neuropathy. (R. at 357.) It was reported that McAllister's history and pattern of abnormality were consistent with alcoholic neuropathy, and no evidence of active cervical neuropathy was noted. (R. at 357.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated July 25, 2008, the ALJ denied McAllister's claims. (R. at 15-25.) The ALJ determined that the medical evidence established that McAllister suffered from severe impairments, namely degenerative joint disease, degenerative disc disease, a back disorder and status post left thumb surgery, but he found that McAllister did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 20.) The ALJ found that McAllister had the residual functional capacity to perform light work limited by an occasional ability to push and pull with his upper and lower extremities, to climb stairs and ramps, to balance, to stoop, to kneel, to crouch and to handle objects with his left nondominant hand and an inability to crawl, to work around moving machinery and unprotected heights and to withstand concentrated exposure to temperature extremes. (R. at 20-21.) Thus, the ALJ found that McAllister was unable to perform his past relevant work as a brick mason and a construction laborer. (R. at 23.) Based on McAllister's age, education, work

history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that McAllister could perform. (R. at 23-24.) Thus, the ALJ found that McAllister was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 24-25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

McAllister argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-18.) In particular, McAllister argues that the ALJ erred by failing to order a consultative examination to determine his his mental impairments. (Plaintiff's Brief at 10-12.) McAllister also argues that the ALJ did not properly evaluate his complaints of pain. (Plaintiff's Brief at 18-21.)

The ALJ in this case found that McAllister had the residual functional capacity to perform light work limited by an occasional ability to push and pull with his upper and lower extremities, to climb stairs and ramps, to balance, to stoop, to kneel, to crouch and to handle objects with his left nondominant hand and an inability to crawl, to work around moving machinery and unprotected heights and to withstand concentrated exposure to temperature extremes. (R. at 20-21.) The ALJ noted that he gave significant weight to the opinions of the state agency physicians in making his finding. (R. at 22-23.) He noted, however, that he imposed less limitations than those noted by the state agency physicians, in that he found that McAllister had no reaching limitations. (R. at 22-23.) The ALJ noted that he based this finding on McAllister's testimony that he did not have any problems with his ability to use his left upper extremity for reaching. (R. at 22-23, 55.) The ALJ also found that McAllister's residual functional capacity was supported by the minimal

objective findings and the limited degree and conservative nature of the treatment he received, in addition to the opinions of the state agency physicians. (R. at 23.)

Based on my review of the record, I do not find that substantial evidence exists to support the ALJ's finding with regard to McAllister's physical residual functional capacity. As noted above, the ALJ gave significant weight to the opinions of the state agency physicians in his determination. (R. at 22-23.) The ALJ noted that he accepted the state agency physicians' opinions, but that he imposed less limitations, in that he found that McAllister had no limitations on his ability to reach. (R. at 22-23.) However, the ALJ failed to mention the limitations placed on McAllister's ability to stand and/or walk.

In determining whether substantial evidence supports the Commissioner's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings. The state agency physicians found that McAllister could stand and/or walk for at least two hours in an eight-hour workday. (R. at 310, 317.) These assessments were made in May and August 2006, and, therefore, the state agency physicians did not have access to subsequent records. (R. at 309-15, 316-22.) In September 2007, an MRI of McAllister's lumbar spine showed degenerative disc

disease, bilateral neuroforaminal encroachment at the L4-L5 level with left-sided neuroforaminal encroachment and degenerative disc bulge at the L5-S1 level. (R. at 338, 353.) In January 2008, x-rays of McAllister's lumbar spine showed degenerative disc disease at the L3-S1 levels. (R. at 368.) An MRI showed bilateral foraminal stenosis at the L4-L5 level and left foraminal stenosis at the L5-S1 level. (R. at 368, 370.) In February 2008, x-rays of McAllister's cervical spine showed degenerative changes predominantly at the C5-C6 disc space, but no instability. (R. at 358, 360.) He was diagnosed with lumbar stenosis and degenerative disc disease. (R. at 358.) Based on this, and the ALJ's failure to discuss the stand and/or walk limitation, I do not find that substantial evidence exists to support the ALJ's finding with regard to McAllister's physical residual functional capacity. Furthermore, based on this finding, I will not address McAllister's argument that the ALJ failed to properly evaluate his complaints of pain.

McAllister argues that the ALJ erred by failing to order a consultative examination to determine the extent of his psychiatric-related problems and that he failed to mention his allegations of nervousness and anxiety. (Plaintiff's Brief at 10-12.) The ALJ did note that McAllister alleged difficulty concentrating and anxiety. (R. at 21.) However, based on my review of the record, McAllister reported in January and April 2004 and February 2005, that his symptoms of depression and anxiety had improved with medication. (R. at 232, 234, 256.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). In addition, there is no indication that any of McAllister's physicians referred him for psychiatric counseling or treatment, nor did they place any restrictions on his work-related mental abilities. Based on this, I find that substantial evidence exists to support the ALJ's finding that

McAllister did not suffer from a severe mental impairment.

For all of the above-stated reasons, I find that substantial evidence does not exist to support the ALJ's finding with regard to McAllister's physical residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the Commissioner's finding with regard to McAllister's physical residual functional capacity;

2. Substantial evidence exists to support the Commissioner's finding with regard to McAllister's mental residual functional capacity; and

3. Substantial evidence does not exist to support the Commissioner's finding that McAllister was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McAllister's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand this case to the Commissioner for further consideration. I further recommend that the court deny McAllister's request to present oral argument based on my finding that it is not necessary, in that the parties have more than adequately addressed the relevant issues in their written arguments.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: March 31, 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE